## MARGARET J. SANAKER *vs.* BARNETT CUSHWA, ADM'R.

### July Term, 1868.

1. Where the evidence of the witnesses examined on the trial, instead of the facts appearing to the court to have been proven by each, is stated in the bill of exceptions, this court cannot revise a judgment of the court below, unless by rejecting all the parol evidence for the exceptor, and giving full force and credit to that of the adverse party, the decision of the court below still appears to be wrong.

2. A case in which the court below ought to have set aside the verdict of the jury and granted a new trial, because the evidence offered by the plaintiff was not sufficient to warrant the finding of the jury.

Barnett Cushwa, administrator, with the will annexed, of John B. Sanaker, deceased, brought an action of trover in March, 1866, in the circuit court of Berkeley county, against Margaret J. Sanaker, for the value of a negro man bequeathed specifically, after the payment of testator's just debts, by the last will and testament of the deceased to said Margaret J., his sister, the said negro man, being a part of the personal assets of the estate of the testator, which it was alleged was not sufficient to pay his debts, and which negro man the defendant had sold before the institution of the suit. At the December term, 1866, the defendant pleaded not guilty, and in November, 1867, the jury empannelled in the cause rendered a verdict for the plaintiff for 500 dollars damages; the defendant moved the court to set aside the verdict and grant her a new trial on the ground

\* See page 1.

that the verdict was contrary to the law and evidence of the case, and on the 4th of December the court overruled the motion for a new trial and entered judgment for the damages assessed by the jury with interest from the date of the finding and costs.

The plaintiff, on the trial of the cause, introduced as evidence, the will of John B. Sanaker, deceased, showing the bequest aforesaid and the following testimony:

"George Dougherty, a witness who stated that he purchased of Adam Sanaker, whom he considered the agent of defendant, and he thinks he so represented himself to be, a negro boy at the price of 1,000 or 1,100 dollars, and took a bill of sale for the same. This slave belonged to the estate of John B. Sanaker, and would belong to the defendant if the debts were all paid, and when the administrator agreed to let the slave pass into the hands of the defendant; witness does not know whether that was the case or not; when he bought he did not buy the slave as the property of Adam Sanaker, but bought him from Adam Sanaker merely as her agent; witness cannot say that Margaret J. Sanaker signed the bill of sale; would not be certain, but thinks he had a conversation with her as he was passing, and thinks she told him whatever her father did would be right; witness cannot produce the bill of sale, he either transferred it to the person to whom he sold him, or has lost it."

" He then introduced the evidence of Bennett B. Hollis, who said he knew the negro girl which belonged to the estate of John B. Sanaker; she was of little or no value after the death of Sanaker, but became of more value afterwards; cannot give an opinion as to her value in 1860 or 1861.

" Dr. Francis M. Burkhart, who testified that he knew the girl well. She seemed to have some disease of the spine, and was deformed in her appearance. She was of very little value at the death of J. B. Sanaker. She afterwards became a useful woman. She lived for a year or more at Mr. Tabler's, whether hired out or not he could not say. Witness was never called upon to examine her professionally. She might be worth from 150 to 300 or 500 dollars, or she

July Term, Sanaker vs. Cushwa, Adm'r. 1868.

might not be worth anything. He could not express a satisfactory opinion of her value in 1860, 1861 and 1862.

"The defendant introduced the evidence of Adam Sanaker, who testified that he had sold the slave, Sam, to George Dougherty for the sum of 1,000 dollars. This sale was in October, 1860. He was not the agent of his daughter, nor did he sell the slave as her agent. His daughter was opposed to the sale of the slave; was anti-slavery in her sentiments, and would have nothing to do with the sale. Witness sold the slave because he himself had raised him. He was a very bad boy, and had made an attempt upon his life with an axe. His daughter never received any of the money from the sale of said slave. John B. Sanaker left at his death three slaves—a negro man who died shortly afterwards, the negro boy, Sam, which witness sold in October, 1860; the said slave sold remained in the family from the death of John B. Sanaker, until sale, and a girl. This girl was injured by a fall from a cart. She was worth very little after the death of John B. Sanaker, but by careful nursing and attention, she recovered in a great measure from the accident, and would have brought 800 dollars in the market, in 1861 or 1862. She is now living and is a useful and valuable woman. She lived with witness until after President Lincoln's proclamation of emancipation.

"On the day of the sale of the personal property of John B. Sanaker, which was the 30th of November, 1857, the administrator, Barnett Cushwa, dined at witness' house, and he there, at table, said 'I have now sold property enough to pay all the debts;' witness does not remember and cannot say whether the defendant was at the table or not, for there were several persons dining that day from the sale, but he knew she was in the house at the time, a member of the family, and probably waiting on the table, as is usual in country places on such occasions.

"Washington Sanaker testified that he was present in Martinsburg when his father and Mr. Dougherty were negotiating for the sale of the slave Sam, he heard nothing pass in that conversation that his father was selling the slave as the

agent of the defendant; he spoke of making the sale and Mr. Dougherty said it would be necessary to get her name to the bill of sale; when they came to Darkesville to complete the transaction, the defendant was not at the house but at a neighbors in the town.   She was sent for to come home, but refused to come and did not return until Mr. Dougherty left there; witness knew that she was opposed to the sale of the slave, and did not, on that day, sign the bill of sale or have anything to do with the sale."

The defendant procured a supersedeas to the judgment to this court.

*C. J. Faulkner* for plaintiff in error.

The court erred in not setting aside the verdict in the case.

1st. Because the evidence shows conclusively that the defendant had no participation or agency in selling the slave in controversy, and did not receive any of the proceeds of sale.   Upon this point there is no conflict in the evidence. But

2d. If the facts were otherwise, and the defendant had authorized the sale of the slave, the evidence shows that the legal title to the slave had passed from the administrator to the legatee, and that no action at law could be maintained by the administrator to recover the slave or the value thereof.

The will of J. B. Sanaker bequeathed the slave in controversy to the defendant.   It will be admitted that a perfect title to the slave did not vest in the legatee, without the *assent* of the administrator, and the question is, do not the facts in this case show an *assent* by the administrator to the legacy?

The assent of an executor is not required by law to be made in any exact or prescribed form.   It may be either express or implied.   His assent may be inferred from indirect expressions or particular acts, and such constructive permission will be equally available.   2 Williams on Executors, p. 1238; 2 Lomax on Executors, p. 129; 8 Howard, p. 178; 3 Leigh, 686–7.

The assent of the executor may in some cases be *presumed* upon the principle, that in the absence of evidence, the executor shall be presumed to have acted in conformity to his duty.

Thus the legatee's possession and retention of the bequest for some considerable time, without complaint of the executor, would lead to the conclusion that there had been an assent. 2 Lomax on Executors, sec. 12, p. 131; 2 Will on Executors, 1241; *White* vs. *White*, 4 Dev., 257; *Merrill* vs. *Windley*, 3 Dev., 399.

J. B. Sanaker died on the 15th of April, 1857. His will was admitted to probate, and the plaintiff qualified as his administrator with the will annexed, in July, 1857. On the 30th of November, following, the administrator had a sale of the miscellaneous personal property of his testator; the estate was small and the debts few, and he thus had four months to ascertain the amount of these debts. After the close of his sale he announced to the family of the defendant, she being probably present and within hearing, "that he had now sold sufficient property to discharge all the debts of his testator." This was no light or hasty declaration, but made after four months acquaintance with the debts of his small estate, and after calculating the sales of the personal property; made at a large dinner party, before the family and strangers, and could have no other meaning than to announce to the legatee, her father and family, that he had no further claim to the assets of the estate, and that the slaves bequeathed to her, and which were then in her possession, should be regarded as her property. From that day until the summons was issued in this case, on the 1st of March, 1866, nearly nine years, there is no evidence that the administrator ever exercised any act of ownership, or asserted any claim to the slaves or the proceeds thereof, nor is there any evidence that any debt not known to the administrator on the day of sale, and not provided for in said sale, has come against the estate. In truth there is no evidence that the estate of J. B. Sanaker owes one dollar. After an assent by an executor, to a specific legacy, the in-

terest in the chattel bequeathed vests in the legatee, so that she may bring *trover* to recover it, even against the executor himself. So if an executor once assents to a legacy, he can never afterwards retract his assent. If the assent has been completed by payment or *possession*, and afterwards debts appear of which the executor had no previous notice, he may by *bill in equity*, compel the legatee to refund. 2 Williams on executors, p. 124.

A satisfactory reason why indirect expressions and a slight assent by the executor is regarded as sufficient to vest the title in the legatee is to be found in the fact, that such assent cannot materially impair the rights of creditors, for while this assent will exempt the property from execution *at law*, to satisfy a judgment against the executor, it does not operate to impair the right of a creditor to pursue in a court of chancery, the assets of the testator, in the hands of the legatee if necessary for the payment of testators debts. 1 Leigh, 465; 2 Robinson's Practice, 79; 2 Lomax on Executors, 391.

This was the only course open to the plaintiff in this action, if debts, of which the record gives us no information, rendered it proper that the legatee should refund. 4 Munf., 219.

A court of equity may compel a legatee to refund, though a court of law cannot entertain an action for that purpose. 3 East, 123; 3 Bos. & Poll, 169.

An executor may assent to a legacy within the time allowed by law for the payment of debts. 3 Hill, S. C., 159. Or, when by the terms of the will, the legacy is given after the payment of debts, he may assent to it before the debts are paid. 3 Hill, S. C., 156.

*Stanton & Allison* for plaintiff in error.

MAXWELL, J. The only question arising in the record in this case, is, did the court err in overruling the motion of the plaintiff in error for a new trial, on the ground that the verdict was against law and evidence? The bill of excep-

tions states the evidence of the witnesses examined on the trial instead of the facts appearing to the court to have been proven by each. This court cannot, therefore, according to the well settled practice, reverse the judgment, unless, by rejecting all the parol evidence for the exceptor and giving full force and credit to that of the adverse party, the decision of the court below still appears to be wrong. Exclude from the case the evidence of both the witnesses examined for the plaintiff in error in the court below, and will the remaining evidence warrant the verdict rendered?

It appears from the will of John B. Sanaker that the negro man in question was devised to the plaintiff in error, and it appears from the record of the case that the defendant was the personal representative of the said John B. Sanaker.

The plaintiff in the court below, now the defendant in error, to make out his case, introduced before the jury George Dougherty, a witness who stated that he purchased of Adam Sanaker, whom he considered the agent of the defendant, and he thinks he so represented himself to be, a negro boy at the price of 1,000 or 1,100 dollars, and took a bill of sale for the same. This slave belonged to the estate of John B. Sanaker, and would belong to the defendant if the debts were all paid, and when the administrator agreed to let the slave pass into the hands of the defendant; witness does not know whether that was the case or not; when he bought he did not buy the slave as the property of Adam Sanaker, but bought him from Adam Sanaker merely as her agent. Witness cannot say that Margaret J. Sanaker signed the bill of sale; would not be certain, but thinks he had a conversation with her as he was passing, and thinks she told him whatever her father did would be right; witness cannot produce the bill of sale, he either transferred it to the person to whom he sold him or has lost it. He then introduced the evidence of Bennett B. Hollis, who said he knew the negro girl which belonged to the estate of John B. Sanaker; she was of little or no value after the death of Sanaker, but became of more value afterwards; cannot

give an opinion of her value in 1860 or 1861. He then introduced Dr. Francis M. Burkhart, who testified that he knew the girl well. She seemed to have some disease of the spine, and was deformed in appearance. She was of very little value at the death of J. B. Sanaker. She afterwards became a useful woman. She lived for a year or more at Mr. Tabler's, whether hired out or not he could not say. Witness was never called upon to examine her professionally. She might be worth from 150 to 300 or 500 dollars, or she might not be worth anything. He could not express a satisfactory opinion of her value in 1860, 1861 and 1862.

·. This is all the evidence introduced by the plaintiff below tending to show that the negro man was sold by or converted to the use of the plaintiff in error.

It seems to me that this evidence is clearly insufficient to prove that Adam Sanaker sold the negro to Dougherty as the agent of the plaintiff in error, or that she ratified the sale afterwards, or received the proceeds of the sale. There is no claim that she sold him herself.

It seems to me that the court ought to have set aside the verdict of the jury, because the evidence offered by the plaintiff was not sufficient to warrant it, and should have granted the plaintiff in error a new trial.

I think this court, therefore, will have to reverse the judgment complained of, with costs to the plaintiff in error, and that the verdict of the jury must be set aside and the cause remanded for a new trial to be had.

President Brown concurred.

JUDGMENT REVERSED.